UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ALEX KUREC

                              Plaintiff,

            -against-                                        5:18-CV-0670 (LEK/TWD)

CSX TRANSPORTATION, INC.

                              Defendant.

_____

**MEMORANDUM-DECISION AND ORDER**

**I.      INTRODUCTION**

        Plaintiff Alex Kurec brings this action against Defendant CSX Transportation, Inc.

under the Federal Railroad Safety Act (the "FRSA"), 49 U.S.C. § 20101 *et seq.*, and New York

Labor Law ("NYLL") § 201-d. Dkt. No. 1 ("Complaint"). In the Complaint, Plaintiff alleges

that Defendant violated the FRSA and NYLL § 201-d by firing him after he: refused to drive to

work during a snowstorm; refused to drive while fatigued; and refused to report to work while

intoxicated. See Compl. ¶ 1.

        Now before the Court is Defendant's motion for summary judgment, which seeks

dismissal of the Complaint in its entirety. Dkt. No. 35 ("Motion"); Dkt. No. 35-15

("Defendant's Statement of Material Facts" or "Defendant's SMF"); Dkt. No. 35-16

("Defendant's Memorandum"). Plaintiff opposes the Motion. Dkt. No. 38 ("Opposition"); Dkt.

No. 38-1 ("Plaintiff's Statement of Material Facts" or "Plaintiff's SMF"). Defendant filed a

reply in support of its Motion. Dkt. No. 41 ("Reply"); Dkt. No. 41-4 ("Defendant's Reply to

Plaintiff's SMF").

        For the reasons discussed below, the Court denies Defendant's Motion but dismisses

Plaintiff's NYLL claim for lack of subject-matter jurisdiction.

## II.    BACKGROUND

### A.  Factual History

The following facts are undisputed, except where otherwise noted.

#### 1.  The Parties

Plaintiff, an engineer, was employed by Defendant from 2007 until July 18, 2017. Def.'s SMF ¶¶ 1, 93; Pl.'s SMF at 1, 26. Defendant is CSX Transportation, Inc., a provider of freight rail transportation services. Compl. ¶ 3; Dkt. No. 17 ("Answer") ¶ 3.

#### 2.  Plaintiff's Job Function

Defendant initially hired Plaintiff as a managerial-level trainee but promoted him a number of times: first to assistant roadmaster, then to roadmaster, and finally, to assistant division engineer in October 2015. See Def.'s SMF ¶¶ 1, 3, 5; Pl.'s SMF at 1. As an assistant division engineer, Plaintiff oversaw track maintenance for the areas between Selkirk and Syracuse, New York and between Syracuse and Montréal, Quebec. See Def.'s SMF ¶ 7. In that role, Plaintiff reported to Albany Division Engineer Joshua Brass, who reported to Greg Mellish, Defendant's Chief Engineer for the North. See Def.'s SMF ¶¶ 16, 18; Pl.'s SMF at 2.

Defendant asserts that Plaintiff "understood that as an Assistant Division Engineer . . . he was expected to be available for railroad operations all day, every day, including in particular, emergencies that arose in his territory." Id. ¶ 12; see also Def.'s Mem. at 5, 7. Plaintiff has at times agreed and at times disagreed that he was constantly on call. Compare

Dkt. No. 35-2 ("Plaintiff's Deposition") at 9[1] (Plaintiff's statement that his set schedule was "24/7/365") with Pl.'s SMF at 2 (disputing this characterization of Plaintiff's hours and stating that "CSX does not expect its managers to always be on call").

### 3. Plaintiff's Job Performance

Defendant alleges that it fired Plaintiff due to "a pattern of neglect, lack of engagement, and insubordination that gave rise to serious safety concerns that posed a risk of derailments and grade crossing accidents, and slowed rail operations in Kurec's territory." Def.'s Mem. at 5. Plaintiff, on the other hand, argues that he was retaliated against for engaging in FRSA-protected activity. See Opp'n at 7. Accordingly, the Court next examines Plaintiff's record while working for Defendant.

### a. The March 2017 Warp Discovery

In March 2017, Defendant's track geometry car discovered a three-and-a-half inch warp on rail within Plaintiff's territory. See Def.'s Mem. at 8; Def.'s SMF ¶ 20; Pl.'s Dep. at 9. The warp, which was large enough to derail a train, was discovered on track that Plaintiff was tasked with inspecting every sixty days. See Def.'s SMF ¶ 21; Dkt. No. 38-2 ("Plaintiff's Declaration") ¶ 3. Though Brass spoke to Plaintiff about the track condition, see Pl.'s Dep. at 9, no disciplinary record regarding the warp discovery exists. See Dkt. No. 35-5 ("Brass Deposition") at 7.

### b. The March 2017 Snowstorm and Plaintiff's Response

On March 14, 2017, a snowstorm dumped 15-to-24 inches of snow throughout

---

[1] Where the Court cites to deposition testimony, it refers to the page numbers produced by CM/ECF, not the transcript pagination.

Defendant's Albany Division. See Def.'s SMF ¶ 34; see also Pl.'s Dep. at 13. The winter storm did not come as a surprise; in the days leading up to it, Brass sent forecasts and instructions to Plaintiff and others in the same role. See Dkt. No. 35-6 (emails from Brass to Defendant's Albany engineering division). On the day the storm hit, Brass called Plaintiff, see Def.'s SMF ¶ 36; Pl.'s SMF at 7, but the parties' retellings of their conversation diverge. In Defendant's version, Brass told Plaintiff he was needed in Selkirk that night to oversee operations at the switching yard there. See Def.'s SMF ¶¶ 35–36. According to Defendant, Plaintiff refused, saying he would go the following day because he preferred to be with his family in Syracuse overnight. See id. at 36–37. In Plaintiff's version, Brass simply asked Plaintiff for his plans. According to Plaintiff, he told Brass that he wished to spend the night in Syracuse and drive to Selkirk the next morning once the roads had been plowed and there was less chance of an accident. See Pl.'s SMF at 7–8; Pl.'s Decl. ¶ 5.[2] Regardless of whether Plaintiff defied Brass' order or merely expressed a preference without opposing Brass' instructions, the parties agree

---

[2]   Defendant argues that the Court should refuse to consider statements in Plaintiff's Declaration that are in direct contrast to Plaintiff's deposition testimony. See Def.'s Reply to Pl.'s SMF at 1 (citing 11 MOORE'S FEDERAL PRACTICE — CIVIL § 56.94(5)(d)). For example, Defendant asks the Court to ignore Plaintiff's assertion in his declaration that he told Brass he feared an accident if he drove to Selkirk that night and instead focus on Plaintiff's testimony at his deposition that he told Brass that he preferred to stay overnight with his family before driving to Selkirk the following morning. See Def.'s Reply to Pl.'s SMF at 2–3. The Court rejects this argument for two reasons. First, the two statements are not in conflict; it is possible Plaintiff actually gave Brass multiple reasons for not wanting to drive to Selkirk that night and simply failed to testify completely at his deposition. The same subsection of Moore's Federal Practice quoted by Defendant warns against exactly that scenario. See MOORE'S, supra, § 56.94(5)(d) ("Witnesses with the best intentions may have difficulty testifying accurately and precisely . . . . Therefore, the general wisdom that deposition testimony is more accurate than statements in an affidavit or declaration should be taken with a grain of salt."). Second, that subsection also instructs the Court not to partake in weighing one form of evidence against another at the summary judgment stage. Id. ("[T]here is the serious question of why a court, considering a summary judgment motion, should be engaged in any form of 'weighing' of the evidence.").

that Brass was unhappy with Plaintiff's choice not to travel to Selkirk on March 14, 2017.

See Def.'s SMF ¶ 38; Pl.'s Dep. at 16.

### c.  The Blowtorch Violation

At some point during 2017, an employee under Plaintiff's supervision used a blowtorch

to cut a bolt hole in rail on track within Plaintiff's territory. See Def.'s SMF ¶ 42; Pl.'s Dep. at

10. Use of a blowtorch to cut holes in rails violates Defendant's policies and federal regulations

and shortcuts the recommended practice of using a drill. See Def.'s SMF ¶ 43, 45. Blowtorch

use could lead to a derailment. See Def.'s SMF ¶ 44; Pl.'s Dep. at 10. Defendant states that

Plaintiff was "held responsible" and "coached" for the employee's blowtorch use. See Def.'s

SMF ¶ 46. Plaintiff maintains that he was not disciplined for the blowtorch incident. See Pl.'s

SMF at 10.

### d.  The Transport Canada Notices and Plaintiff's Response

In June 2017, Transport Canada, Canada's transportation department, identified a

number of defects on sections of Defendant's track over which Plaintiff had oversight authority.

See Def.'s SMF ¶ 47. Specifically, on June 21, 2017, Transport Canada issued Defendant a

notice imposing a temporary speed restriction due to vegetation conditions that created reduced

sightlines at private crossings. Dkt. No. 35-7. On June 23, 2017, Transport Canada issued

Defendant another notice, this time regarding gaps between the road surface and the tops of the

rail. Dkt. No. 35-8.

Then, on July 13, 2017, Transport Canada issued Defendant a Notice and Order due to a

number of issues discovered during an inspection the day before. Dkt. No. 35-9. Brass asked

Plaintiff to travel to Canada that night to "personally assess the defects and start putting

together a remediation plan[.]" Def.'s SMF ¶ 54. Defendant asserts that Plaintiff told Brass that

his request "was bullshit," that he was driving from Philadelphia back to New York after

participating in training, and that he wanted to stay home and put his kids to bed. See Def.'s

SMF ¶ 55. Plaintiff alleges that he had just finished working 16 consecutive hours and therefore

declined because he felt he needed to rest. Pl.'s Decl. ¶ 7.[3] The parties agree that Plaintiff did

not travel to Canada until early on the morning of July 14, 2017. See Def.'s SMF ¶ 58; Pl.'s

Dep. at 21.

### e.  The July 15, 2017 Derailment and Plaintiff's Response and Discharge

On the night of July 15, 2017, a train derailed in Selkirk Yard, within Plaintiff's

territory. See Def.'s SMF ¶ 64; Pl.'s Dep. at 7, 21. At 11:46 p.m., Brass called Plaintiff and told

him to report to the derailment site. Def.'s SMF ¶ 66; Pl.'s SMF at 16. Plaintiff told Brass that

he had been drinking and did not feel safe driving. Def.'s SMF ¶ 67; Pl.'s SMF at 17. Plaintiff

then called a roadmaster he supervised, who agreed to respond to the derailment. Def.'s SMF ¶

71; Pl.'s SMF at 20.

Plaintiff testified that he began driving to the derailment the next morning when he

received a call from Brass, who told him not to go to Selkirk Yard and that his employment was

under review. See Def.'s SMF ¶ 75; Pl.'s SMF at 22; Pl.'s Dep. at 24. On July 18, 2017,

Plaintiff was informed by Greg Mellish, then Defendant's Chief Engineer for the North, that he

was terminated. See Pl.'s Dep. at 25; Def.'s SMF ¶ 93; Pl.'s SMF at 26. Mellish made the

decision to terminate Plaintiff with input from Brass. See Def.'s SMF ¶ 84; Pl.'s SMF at 23; see

---

[3]  Here, too, Defendant asks the Court to disregard Plaintiff's Declaration in favor of his
deposition testimony. As discussed supra, n.2, the Court will not do so at this stage.

6

<u>also</u> Dkt. No. 35-3 ("Mellish Deposition") at 4.

**B. Procedural History**

Plaintiff initiated this lawsuit on June 7, 2018. Docket. On October 21, 2019, Defendant moved for summary judgment. <u>Id.</u> Plaintiff filed his Response on November 19, 2019. <u>Id.</u> Defendant filed its Reply on November 27, 2019. <u>Id.</u>

**III.   LEGAL STANDARD**

Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u>; <u>see also</u> <u>Taggart v. Time, Inc.</u>, 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Similarly, the movant is entitled to summary judgment when the nonmoving party has failed "to establish the existence of an element essential to [the movant's] case, and on which [the movant] will bear the burden of proof at trial." <u>Id.</u> at 322.

In attempting to repel a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Hence, "a court's duty in reviewing a motion for summary judgment is 'carefully limited' to finding genuine disputes of fact, 'not to deciding them.'" Macera v. Vill. Bd. of Ilion, No. 16-CV-668, 2019 U.S. Dist. LEXIS 169632, at *26 (N.D.N.Y. Sept. 30, 2019) (Kahn, J.) (quoting Gallo v. Prudential Residential Servs., Ltd.. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994)).

## IV.    DISCUSSION

### A.  FRSA

FRSA's purpose is to "promote safety in every area of railroad operations." 49 U.S.C. § 20101. Plaintiff claims protection under two separate FRSA provisions. First, Plaintiff alleges Defendant violated 49 U.S.C. § 20101(a), which states in relevant part that a railroad carrier "may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done . . . to refuse to violate or assist in the violation of any Federal law, rule, or regulation relating to railroad safety or security[.]" § 20101(a)(2). Second, Plaintiff alleges Defendant violated § 20101(b), which prevents railroads from discharging an employee for "reporting, in good faith, a hazardous safety or security condition" or "refusing to work when confronted by a hazardous safety or security condition related to the performance of the employee's duties." §

8

20101(b)(1)(A)–(B).

To establish a prima facie case of FRSA retaliation, an employee must show by a preponderance of evidence that: (1) he engaged in protected activity as defined by the statute; (2) his employer knew that he had engaged in protected activity; (3) he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action. See, e.g., Bechtel v. Admin. Review Bd., 710 F.3d 443, 447 (2d Cir. 2013); Conrad v. CSX Transp., Inc., 824 F.3d 103, 107 (4th Cir. 2016).

As threshold matters, the parties dispute: (1) the number of claims raised by Plaintiff;[4] (2) whether Defendant has moved for summary judgment on all of them; and (3) whether Plaintiff has exhausted his administrative remedies. The Court finds that Plaintiff has asserted two FRSA claims: one under § 20109(a) and one under § 20109(b). See Compl. at 4–5. Next, the Court finds that Defendant has moved for summary judgment on both.[5] Finally, assuming

---

[4] Defendant argues that the Complaint's only claim relates to Plaintiff's refusal to drive to the derailment. See Reply at 5 (arguing the Opposition attempted to "improperly add for the first time two new claims of alleged FRSA-protected activity, neither of which are supported by the record and neither of which were previously raised in this litigation"). This argument ignores that a single retaliation claim can be based on multiple instances of allegedly protected activity. See, e.g., Kretzmon v. Erie County, No. 11-CV-704, 2013 U.S. Dist. LEXIS 23270, at *14 (W.D.N.Y. Feb. 20, 2013) (finding, in analyzing a single Title VII retaliation claim, that plaintiff "engaged in multiple protected activities"). While the Complaint raises only two FRSA claims, those claims are collectively based on three instances of allegedly protected activity. First, Plaintiff claims protection for his March 14, 2017 report of inclement weather and his refusal to drive in it. Compl. ¶ 17; Opp'n at 7. Second, Plaintiff claims protection for his refusal, citing fatigue, to drive to a July 14, 2017 meeting the night before it was to take place. Compl. ¶ 8. Third, Plaintiff claims protection for his refusal to drive to the July 15, 2017 derailment while intoxicated. Compl. ¶¶ 9–14.

[5] The Motion clearly seeks dismissal of the Complaint in its entirety. See Dkt. No. 35-1 ("Declaration of Attorney Roney") ¶ 2; Def.'s Mem. at 26; see also C.G. v. Gann, 231 Fed. App'x. 851, 853 (11th Cir. 2007) (noting, in finding a summary judgment motion covered all claims, that the motion explicitly said defendants sought "summary judgment in their favor as to all claims").

9

without deciding that Plaintiff was required to exhaust, the Court finds that he has.[6]

   *1. Section 20109(a)(2)*

Section 20109(a) states that a railroad carrier "may not discharge . . . an employee if

such discrimination is due, in whole or in part, to the employee's lawful, good faith act done . . .

to refuse to violate or assist in the violation of any Federal law, rule, or regulation relating to

railroad safety or security[.]" § 20109(a)(2).  The Court concludes that genuine disputes of

material fact exist as to: (1) whether Plaintiff's refusal to report was in good faith and therefore

protected; and (2) whether Plaintiff's refusal to report was a contributing factor in his

termination. Accordingly, the Court denies Defendant's Motion on Plaintiff's § 20109(a) claim.

   a. Whether Plaintiff Engaged in Protected Activity

Plaintiff alleges only one instance of protected activity in his § 20109(a) claim: his

refusal to drive, while intoxicated, to the derailment on July 15, 2017. See Compl. ¶ 25. In other

words, he argues that, when he declined to report to the derailment while intoxicated, he was

"refus[ing] to violate" a "Federal law, rule, or regulation relating to railroad safety or

security[.]" § 20109(a)(2).[7] The Court holds that a genuine dispute of material fact exists as to

---

[6]  Plaintiff exhausted through his September 1, 2017 complaint to the Occupational Safety and Health Administration ("OSHA"), Dkt. No. 41-2 (the "OSHA Complaint"). As Defendant notes, "[t]he OSHA and federal court complaints are almost identical." Reply at 5. This case stands in contrast to Foster v. BNSF Ry. Co., 866 F.3d 962 (8th Cir. 2017), upon which Defendant relies. In finding certain FRSA claims unexhausted, the Eighth Circuit in Foster found it significant that the administrative complaint "never mentioned" the facts supporting those claims. Because all three of the instances of alleged protected activity were included in the OSHA Complaint, see OSHA Complaint ¶¶ 15, 18, the Court finds that Plaintiff has exhausted.

[7]  Plaintiff does not specify *which* "Federal law, rule, or regulation relating to railroad safety or security" he refused to violate when he refused to report to the derailment while intoxicated. See generally Compl.; Opp'n. A court in this Circuit has treated such an omission as "fatal to a claim premised on [§] 20109(a)(2)." Gonzalez v. Metro-North Commuter R.R., No. 18-CV-10270, 2020

whether Plaintiff's refusal to violate federal regulations by reporting to work while intoxicated was in good faith and, therefore, a protected activity under subsection (a)(2).

There is a split in authority regarding whether subsection (a)(2) protects a railroad worker who does not report to work while under the influence of a substance. The Court first explains why it does not follow the principal case on which Defendant relies: Lockhart v. Long Island R.R. Co., 266 F. Supp. 3d 659 (S.D.N.Y. 2017), aff'd sub nom. Lockhart v. MTA Long Island R.R., 949 F.3d 75 (2d Cir. 2020).

In Lockhart, a court in this District held that subsection (a)(2) did not protect a railroad worker from discipline by his employer when he stayed home after taking Oxycodone as treatment for an injury. Lockhart, 266 F.Supp. 3d at 664. Accordingly, the Lockhart court granted summary judgment to the defendant-railroad. Id. at 665.[8]

---

U.S. Dist. LEXIS 9059, at *24 (S.D.N.Y. Jan. 15, 2020). On the other hand, one federal appeals court has not even required there to be an actual "Federal law, rule, or regulation"on the books that the worker was at risk of violating—as long as the worker *believed in good faith* that he would violate such a provision if he did not refuse to do some action. See Rookaird v. Bnsf Ry. Co., 908 F.3d 451, 457 (9th Cir. 2018). Assuming without deciding that a subsection(a)(2) claim requires some in-effect federal edict, the Court takes judicial notice of a Federal Railroad Administration regulation prohibiting "regulated employee[s]" from reporting while "[u]nder the influence of or impaired by alcohol[.]" 49 CFR § 219.101(a)(2). Defendant argues that Plaintiff did not refuse to violate a federal regulation because, as a manager, "he was not subject to hours of service limitations." Reply at 13 n.5. But Part 219's definition of "regulated employee" was amended in 2017 to also cover maintenance-of-way employees. See 81 Fed. Reg. 37894 (June 10, 2016) (final rule effective June 12, 2017). -"Maintenance-of-way employee . . . means a roadway worker as defined in [49 CFR 214.7]." 49 CFR 219.5. "Roadway worker" is defined as "any employee of a railroad . . . whose duties include inspection, construction, maintenance or repair of railroad track[.]" 49 CFR 214.7. The Court finds this definition broad enough to encapsulate Plaintiff's job responsibilities. See Pl.'s Dep. at 7 (Plaintiff's statement that he was responsible for track maintenance).

[8]   The Second Circuit affirmed the district court's grant of summary judgment to the defendant-railroad. See Lockhart, 949 F.3d at 80. However, it did so on the grounds that the employee's medical absences were unprotected because they were undocumented. See id. at 79.

First, the Lockhart court emphasized that "there is no authority, or basis, to conclude that [§ 20109(a)(2)] extends to the situation presented here: an employee's inability to report to work due to his self-reported use of narcotics for non-work-related reasons." Id. at 664 (noting a lack of authority "for the proposition that subsection (a)(2) covers non-railroad equipment-related conditions such as an employee's inability to report to work due to his use of prescribed narcotics").

In response, this Court first turns to the plain text of the statute. See United States v. Gayle, 342 F.3d 89, 92 (2d Cir. 2003) ("Statutory construction begins with the plain text and, if that text is unambiguous, it usually ends there as well."). Examining subsection (a)(2), the Court finds no basis to cabin its applicability—as the Lockhart court apparently would— to refusals to violate laws and regulations pertaining to railroad machinery. § 20109(a)(2) (protecting employees from discipline if they "refuse to violate or assist in the violation of *any* Federal law, rule, or regulation relating to railroad safety or security") (emphasis added). Even if this Court were to hold that a refusing worker must contemplate an actual provision, rather than an imagined one, see supra n.7, regulations prohibiting on-the-job inebriation clearly "relat[e] to railroad safety or security," see § 20109(a)(2); see also 49 CFR § 219.1 ("The purpose of this part is to prevent accidents and casualties in railroad operations that result from impairment of employees by alcohol or drugs.").

---

The Second Circuit explicitly did not rule on whether off-the-job activities can be protected by FRSA. See id. ("The parties spill much ink arguing whether the FRSA protects absences due to work-related maladies only, or whether it also covers off-duty injuries such as appellant's toothache. However, we need not reach that issue because even assuming arguendo that off-duty maladies are covered , appellant has failed to demonstrate that his absences, when unaccompanied by SLA-28 forms, were protected activity, as directly required by element (i), and indirectly by (ii) and (iv).").

Second, the court in <u>Lockhart</u> was concerned about the "absurd result[]" of insulating an employee "who declined to report to work because he or she was drunk or high on drugs[.]" <u>Lockhart</u>, 266 F.Supp. 3d at 664 (quoting <u>S.E.C. v. Rosenthal</u>, 650 F.3d 156, 162 (2d Cir. 2011)). In other words, the <u>Lockhart</u> court appears to have been worried precisely about this scenario—a worker immunizing himself from discipline by being under the influence for recreational purposes.

The Court again looks to the plain text of § 20109(a), which assuages any similar fears. The statute imposes a "good faith" requirement on a worker's safety-related refusal to violate a federal law or regulation. <u>See</u> § 20109(a); <u>see also</u> <u>Rookaird v. Bnsf Ry. Co.</u>, 908 F.3d 451, 457 (9th Cir. 2018) (noting that the good-faith requirement "applies throughout subsection (a)"). Instructively, courts have interpreted the meaning of "good faith" in the context of § 20109(b)(1)(A), another FRSA provision at issue in this case that insulates employees who make a good-faith report of "a hazardous safety or security condition[.]" § 20109(b)(1)(A). In the context of subsection (b)(1)(A), courts have interpreted "good faith" to include both an objective and a subjective component. <u>See, e.g.</u>, <u>March v. Metro-North R.R.</u>, 533 (S.D.N.Y. 2019); <u>Lillian v. Nat'l R.R. Passenger Corp.</u>, 259 F.Supp. 3d 837, 843 (N.D. Ill. 2017) (citing <u>Lang v. Nw. Univ.</u>, 472 F.3d 493, 495 (7th Cir. 2006) ("As stated earlier, the [FRSA] protects an employee from adverse action when reporting, in good faith, a hazardous safety or security condition. Our Court of Appeals has held that 'good faith,' as that concept was at issue in a different whistleblower statute, contains both a subjective and an objective component.").[9]

---

[9] The fact that good faith under the FRSA is also assessed objectively serves to further alleviate any of this Court's concerns about the "absurd result[]" contemplated by <u>Lockhart</u>, 266 F.Supp. 3d at 664 (quoting <u>Rosenthal</u>, 650 F.3d at 162). A worker who refuses to report to work

The Court finds that a reasonable jury could conclude that Plaintiff's refusal to report to the derailment was done, both subjectively and objectively, in good faith. See Bostek v. Norfolk S. Ry. Co., No. 16-CV-2416, 2019 U.S. Dist. LEXIS 110623, at *10 (N.D. Ohio July 2, 2019) (denying defendant's summary judgment motion on FRSA claim after finding "a jury could reasonably conclude" plaintiff acted in good faith). First, though Plaintiff has characterized his job as "24/7/365," Pl.'s Dep. at 9, the derailment occurred at a time at which he might reasonably have expected he would not need to work. Plaintiff was not on call on the night of the derailment. See Brass Dep. at 15; Pl.'s Dep. at 24 ("I explained to [Mellish] that I was not the weekend duty officer, Mr. Brass was the weekend duty officer.").[10] And the parties agree that Plaintiff was not prohibited from drinking while off duty and not on call, see Pl.'s SMF at 26; Def.'s Reply to Pl.'s SMF at 8. Second, Plaintiff quickly contacted an employee he supervised who agreed to respond to the derailment. See Def.'s SMF ¶ 71; Pl.'s SMF at 20. Third, Plaintiff alleges that, after learning about the derailment, he stopped drinking and went to sleep. See Pl.'s SMF at 17 (citing Pl.'s Dep. at 23). Fourth, Plaintiff set off for the derailment site early the next morning, having apparently sobered up, before his supervisor called and

---

due to intoxication during a time when he knew he would be working would surely not be acting in good faith, objectively speaking, and thus would not enjoy FRSA protection. See Cieslicki v. Soo Line R.R. Co., ARB No. 19-65, 2020 DOL Ad. Rev. Bd. LEXIS 177 (June 4, 2020) (per curiam) ("If an employer decides to discipline an employee because the employee voluntarily chose to become impaired at a time when the employee knew that he should not be impaired (because he was on call, or because it was illegal), then the employer is not prohibited by the FRSA from taking disciplinary action.").

[10] Plaintiff admitted that everyone is responsible for responding to emergencies. See Pl.'s Dep. at 24, 29. Nevertheless, the question of whether Plaintiff acted in good faith in refusing to report to the derailment is one for the jury. See Rookaird, 908 F.3d at 457 (noting, in the context of subsection (a)(2), that the jury made the good-faith determination).

instructed him not to report. <u>See</u> Def.'s SMF ¶ 75; Pl.'s SMF at 21–22; Pl.'s Dep. at 24.

In sum, this Court will not follow <u>Lockhart</u> both because of what FRSA says and because of what it does not. The statute says that an employee's refusal to violate a federal law or regulation must be "lawful" and in "good faith," § 20109(a), both of which serve as non-trivial limitations on who can claim FRSA protection. The statute does not say that an employee's refusal to violate a federal edict must be related to railroad equipment. Nor does FRSA's plain text contain any other indication that a worker cannot ever be protected in refusing to violate limitations on drug and alcohol use.

While it might have been true when <u>Lockhart</u> was decided that "there is no authority . . . to conclude that [§ 20109(a)(2)] extends to . . .  an employee's inability to report to work due to his self-reported use of narcotics for non-work-related reasons", <u>Lockhart</u>, 266 F.Supp. 3d at 664, that is no longer the case. When confronted with facts essentially analogous to the instant case, the Department of Labor's Administrative Review Board ("ARB") ruled in favor of the employee. <u>Cieslicki v. Soo Line R.R. Co.</u>, ARB No. 19-65, 2020 DOL Ad. Rev. Bd. LEXIS 177 (June 4, 2020) (per curiam). In <u>Cieslicki</u>, a railroad worker was terminated for refusing to report to work after consuming two glasses of wine with dinner. <u>Id.</u> at *1. The ARB reversed and remanded the decision of an administrative judge who had followed <u>Lockhart</u> in dismissing the claim. <u>Id.</u> at *15.

This Court finds <u>Cieslicki</u>'s reasoning persuasive and its interpretation of subsection (a)(2) entitled to deference.[11, 12] As the ARB held, the moment a railroad worker refuses to

---

[11]  The Second Circuit has deferred to the ARB's interpretation of other federal statutes under <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134 (1944). <u>See</u> <u>Nielsen v. AECOM Tech. Corp.</u>, 762 F.3d 214 (2d Cir. 2014) (adopting ARB interpretation of whistleblower retaliation provision of the

violate a federal railroad safety edict, he has engaged in FRSA-protected activity. See id. at *8.

The Cieslicki holding comports with subsection(a)(2)'s plain text. See § 20109(a)(2)

(protecting "refus[als] to violate or assist in the violation of *any* Federal law, rule, or regulation

relating to railroad safety or security") (emphasis added). And, as Cieslicki points out, the

Lockhart holding could itself lead to an absurd result: an off-duty employee who "drinks

alcoholic beverages (as adults of legal age are allowed to do), gets called to work unexpectedly,

and then has to choose between working in an impaired state on the railroad (violating federal

law . . . ), or getting fired for indicating that he cannot safely report for duty." Cieslicki, 2020

DOL Ad. Rev. Bd. LEXIS 177, at *14.

  The summary judgment standard contains two prongs, neither of which Defendant has

demonstrated with regard to the protected activity element of Plaintiff's prima facie case.

Defendant has not shown it is "entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a),

because subsection(a)(2)'s plain language covers refusals to violate federal edicts related to

railroad safety. And Defendant has not demonstrated the absence of a "genuine dispute as to

any material fact", id., because one exists as to whether Plaintiff's refusal was in "good faith"

---

Sarbanes-Oxley Act of 2002). Under Skidmore, the persuasiveness of an agency interpretation is tied to "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." Skidmore, 323 U.S. at 140. The Court finds that Cieslicki's thoroughness, valid reasoning, and persuasive power entitle it to considerable deference.

  [12] Defendant attempts to draw a distinction between appeals of ARB decisions to circuit courts, where Defendant seems to suggest the ARB decision appealed from could be entitled to deference, and original actions initiated in federal court, where the ARB decision should not hold weight. See Reply at 14 n.7. The Court finds no support for such a distinction in the case law. For example, Nielsen involved an appeal of a district court's dismissal of a retaliation claim, not an ARB appeal; nevertheless, the Second Circuit gave some deference to an ARB interpretation. See supra n.11.

as required by the statute. See § 20109(a).

        b. Whether the Protected Activity was a Contributing Factor to Plaintiff's
        Discharge

Defendant does not argue that it did not know of Plaintiff's protected activity or that Plaintiff did not suffer an unfavorable personnel action. See generally Def.'s Mem.; Reply. Accordingly, the Court next turns to the only other disputed element of a prima facie FRSA case: whether the protected activity was a contributing factor to the adverse employment action. The Court holds that a genuine dispute of material fact exists as to whether Plaintiff's refusal to violate federal law or regulation by reporting to the derailment was a contributing factor in his termination.[13]

"A contributing factor is 'any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision.'" Niedziejko v. Del. & Hudson Ry. Co., No. 18-CV-675, 2019 U.S. Dist. LEXIS 514666, at *93 (N.D.N.Y. Mar. 27, 2019) (quoting Araujo v. New Jersey Transit Rail Op., Inc., 708 F.3d 152, 158 (3d Cir. 2013)). "[T]he contributing factor that an employee must prove is intentional retaliation prompted by the employee engaging in protected activity." See, e.g., Kuduk v. BNSF Ry. Co., 768 F.3d 786, 791 (8th Cir. 2014). But courts have not required direct evidence showing that the protected activity was a contributing factor in the adverse employment action; circumstantial evidence may be

---

      [13]   The Court notes that the protected activity for Plaintiff's subsection (a)(2) claim is his refusal to violate federal law, not his refusal to report to the derailment. However, in "contributing factor" analysis, courts focus on the work-related consequence of the refusal to violate federal law instead of the refusal to break the law itself. See Rookaird, 908 F.3d at 463 ("Viewing that evidence in the light most favorable to BNSF, a reasonable jury could find that Rookaird's *refusal to stop the air-brake test* did not contribute to BNSF's decision to terminate him.") (emphasis added).

considered. See Niedziejko, 2019 U.S. Dist. LEXIS 514666, at *93 (citing Araujo, 708 F.3d at

161). Relevant circumstantial evidence may include: "temporal proximity, indications of

pretext, inconsistent application of an employer's policies, an employer's shifting explanations

for its actions, antagonism or hostility toward a complainant's protected activity, the falsity of

an employer's explanation for the adverse action taken, and a change in the employer's attitude

toward the complainant[.]" Ray v. Union Pac. R.R. Co., 971 F. Supp. 2d 869, 885 (S.D. Iowa

2013).

The Court starts by accounting for "evidence of the employer's non-retaliatory reasons"

for Plaintiff's discharge. See Tompkins v. Metro-North Commuter R.R., No. 16-CV-9920,

2018 U.S. Dist. LEXIS 163198, at *19 (S.D.N.Y. Sept. 24, 2018) (internal quotation marks

omitted). Plaintiff's supervisors were troubled by "his utter lack of concern and engagement in

the face of a serious and immediate problem, a derailment, in his territory[.]" Def.'s Mem. at

23. Defendant asserts it fired Plaintiff due to his "poor performance and insubordination in

multiple instances throughout 2017." Id. at 24. But Defendant seems to admit Plaintiff's refusal

played a role in his termination, saying it fired Plaintiff for a "pattern of behavior [that]

culminated on July 15, 2017, when Kurec failed to engage or oversee the remediation of a

derailment site in Albany." Id. at 5. Defendant portrays Plaintiff's reaction to the derailment as

disengaged in ways that extended beyond his refusal to respond to the site. See Def.'s SMF ¶ 68

("Brass was taken aback by Kurec's lack of response to their conversation and his lack of

engagement or concern over the derailment."). But the parties seem to agree that Plaintiff would

not have been terminated had he reported to work on the evening of July 15, 2017. See Reply at

9 ("[Brass and Mellish] said that, if not for Kurec's failure to report to the derailment, Kurec

18

would not have been terminated."). Clearly then, Plaintiff's refusal to violate federal regulations by reporting to the derailment "tend[ed] to affect . . . the outcome of the decision." Kuduk, 768 F.3d at 791.

Turning to the above categories of circumstantial evidence, the Court finds that there is a "genuine dispute as to any material fact" as to whether Plaintiff's refusal was a contributing factor in his discharge. Fed. R. Civ. P. 56(a).

### i.  Temporal Proximity

The temporal proximity between Plaintiff's protected activity and the unfavorable employment action strongly suggests that Plaintiff's refusal to report to the derailment was a "contributing factor" to his termination. Temporal proximity is "often the most persuasive factor" in retaliation claims requiring a showing of causation between the protected activity and the adverse action. Beliveau v. United States DOL, 170 F.3d 83, 87 (1st Cir. 1999) (Toxic Substances Control Act retaliation claim). In the context of Title VII retaliation claims, "[c]ourts in this Circuit have held that periods of two months or more defeat an inference of causation." Doner-Hedrick v. N.Y. Inst. of Tech., 874 F. Supp. 2d 227 (S.D.N.Y. 2012) (internal quotation marks omitted).

Again, ARB precedent is instructive. In Henderson v. Wheeling & Lake Erie Railway, the ARB reversed an administrative judge's grant of summary judgment to the defendant-railroad. ARB No. 11-13, 2012 DOL Ad. Rev. Bd. LEXIS 106 (Oct. 12, 2012). The ARB found that a four-day gap between the employee's protected activity and the employer's initiation of an investigation was "sufficient to raise an inference of causation." Id. at *28.

Here, the Court is faced with an even shorter gap. Late in the evening of July 15, 2017,

Plaintiff refused to report to the derailment. See Def.'s SMF ¶ 66–67; Pl.'s SMF at 16–17. By the next morning, his job status was under review, see Def.'s SMF ¶ 75; Pl.'s SMF at 22; Pl.'s Dep. at 24, and by July 18, 2017, he had been fired, see Pl.'s Dep. at 25; Def.'s SMF ¶ 93; Pl.'s SMF at 26. The Court easily concludes that the close temporal proximity between Plaintiff's refusal to report to the derailment and his termination supports a finding that there is a genuine dispute of material fact regarding whether the former was a contributing factor to the latter.[14]

### ii. Employer's Inconsistent Application of Policies

Evidence of Defendant's inconsistent application of workplace policy further persuades the Court that a genuine dispute of material fact exists as to whether Plaintiff's refusal to report to the derailment was a contributing factor to his termination.

First, Mellish chose to demote, rather than terminate, an employee who was responsible for an earlier derailment. See Def.'s Reply to Pl.'s SMF at 7–8; Mellish Dep. at 5. Mellish was then primarily responsible for the decision to terminate Plaintiff, who refused to report to the July 15, 2017 derailment but did not cause it. See Def.'s SMF ¶ 84; Pl.'s SMF at 23; see also Mellish Dep. at 4. The Court finds it to be inconsistent that Defendant chose not to terminate an employee responsible for a derailment yet fired Plaintiff in part for simply not responding to one. Second, Mellish was unable to name another manager he had terminated

---

[14]  In fact, the gap here might be short enough to alone satisfy the causation element of Plaintiff's prima facie case. See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close.") (internal quotation marks omitted); but see Kuduk, 768 F.3d at 792 ("[W]e have consistently held that more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation.") (internal quotation marks omitted). Nevertheless, the Court will examine the other categories of circumstantial evidence.

without first being put on a performance improvement plan. <u>See</u> Def.'s Reply to Pl.'s SMF at 8; Mellish Dep. at 5. These facts support the conclusion that a factual issue exists regarding whether Plaintiff's refusal to violate federal law or regulation by reporting to the derailment was a contributing factor in his termination.

### iii.  Hostility Toward the Protected Activity

The record contains some evidence of hostility toward Plaintiff's refusal to report to the derailment, further supporting a finding that a genuine issue of material fact exists on the contributing factor element of the prima facie case. First, Plaintiff alleges that, when he told Brass he had been drinking and could not report to the derailment, Brass hung up on him. <u>See</u> Pl.'s Dep. at 22. Second, when Brass told Mellish that Plaintiff was refusing to report because he had been drinking, Mellish told Brass that it was "not good" that a manager did not respond to the derailment. <u>See</u> Mellish Dep. at 8. These facts represent additional circumstantial evidence that Plaintiff's refusal to violate federal law by reporting to work was a contributing factor in his termination.

Taken together, the circumstantial evidence is sufficient to create a genuine dispute of material fact regarding whether Plaintiff's refusal to report to work on July 15, 2017, thereby violating federal regulations, contributed to his discharge.

In conclusion, Plaintiff's § 20109(a) claim survives summary judgment. First, Defendant has not shown that Plaintiff's refusal to violate federal law by reporting to the derailment was unprotected as a matter of law, and a reasonable jury could find Plaintiff acted in good faith in so refusing. Second, a genuine dispute of material fact exists as to whether Plaintiff's refusal to report to the derailment in violation of federal law was a contributing

factor in his termination.

### 2. Section 20109(b)

The Court turns to Plaintiff's § 20109(b) claim. Plaintiff seeks the protection of two subsections: one that prevents railroads from firing an employee for "reporting, in good faith, a hazardous safety or security condition," § 20109(b)(1)(A), and one that prevents railroads from firing an employee for "refusing to work when confronted by a hazardous safety or security condition related to the performance of the employee's duties" when certain conditions are met, § 20109(b)(1)(B). Those conditions are: (1) the refusal was in good faith without any reasonable alternative available to the employee; (2) a reasonable individual under the circumstances would conclude that the hazardous condition presented an imminent danger of death or serious injury that cannot be eliminated given the situation's urgency; and (3) if possible, the worker has notified the railroad of the hazardous condition and his intention not to work unless the condition is immediately corrected. See § 20109(b)(2)(A)–(C).

Because Defendant has not established it is entitled to judgment as a matter of law on either disputed element of Plaintiff's prima facie case, and because there are genuine disputes of material fact to be resolved, the Court will not grant summary judgment to Defendant on Plaintiff's § 20109(b) claim.

### a. Whether Plaintiff Engaged in Protected Activity

As discussed above, see supra n.4, Plaintiff bases his § 20109(b) claim on three instances of allegedly protected activity. First, as with his § 20109(a) claim, he alleges his report of his own intoxication and his refusal to drive to the derailment were protected. See Compl. ¶ 30. Second, he claims protection for his March 14, 2017 report of a snowstorm

22

and his refusal to drive to Selkirk in it. Id. Third, he claims protection for his July 13, 2017 report of fatigue and his refusal to drive to Canada that night. Id. The Court examines each activity in turn and concludes that Defendant has failed to show Plaintiff's actions were unprotected as a matter of law and that genuine issues of material fact must be resolved to determine if those actions are entitled to protection under the FRSA.

### i. Refusal to Drive to the Derailment While Intoxicated

Though the Court already determined Defendant is not entitled to summary judgment on whether Plaintiff's refusal to drive to the derailment while intoxicated constituted protected activity under subsection (a)(2), it must reexamine the same set of facts under subsections (b)(1)(A) and (b)(1)(B). The Court finds that Defendant has not established Plaintiff's refusal to report to the derailment was unprotected as a matter of law under either subsection.

The Court begins with subsection (b)(1)(A), which protects employees who "report[], in good faith, a hazardous safety or security condition[.]" § 20109(b)(1)(A). Again, Defendant relies on Lockhart, where the Southern District of New York noted that "courts have uniformly held that" subsection (b)(1)(A) is "limited to 'work-related' conditions and injuries." 266. F. Supp. 3d at 663 (collecting cases). In granting summary judgment to the defendant-railroad, the Lockhart court found that "nothing in subsection (b)(1)(A) 'indicates that the 'hazardous condition' extends beyond work-related safety conditions under the railroad's control and covers personal, non-work illnesses.'" Id. at 664 (quoting Stokes v. SEPTA, 657 Fed. App'x. 79, 82 (3d Cir. 2016)).[15]

---

[15] The Lockhart court's emphasis on Stokes in interpreting subsection (b)(1)(A) is misplaced. Stokes involved a claim under subsection (b)(1)(B), which by its plain terms requires the hazardous condition to be "related to the performance of the employee's duties[.]" See Stokes,

The Court again declines to follow Lockhart's holding. First, the Court finds no basis in FRSA's plain language to suggest that the "hazardous safety or security condition" must be under the railroad's control. Second, Lockhart relies on a misinterpretation of the statute's use of the word "condition." Third, even if the "hazardous safety or security condition" must be work related, the condition reported by Plaintiff has a sufficient nexus to the workplace..

Starting with the statute's text, the only requirement for a report of a "hazardous safety or security condition" to be protected is that the report be made "in good faith." § 20109(b)(1)(A). Nevertheless, the Lockhart court attempts to read into the statute the additional requirement that the condition be within the railroad's control. See Lockhart, 266 F. Supp. 3d at 664. But it is not clear how imposing this requirement would serve Congress' express purpose for enacting FRSA: "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." § 20101.

Next, this Court reads "condition" within the meaning of subsection (b)(1)(A) differently than the Lockhart court appears to have interpreted the term. The court in Lockhart placed its focus on the *plaintiff's* condition. See Lockhart, 266 F. Supp. 3d at 664 ("Lockhart's alleged need for Oxycodone to alleviate shoulder pain arising from an injury three

---

657 Fed. App'x. at 82; § 20109(b)(1)(B). In other words, the condition must be work related. But Lockhart attempts to transpose this requirement onto a claim under subsection (b)(1)(A), which contains no similar language tying the condition to the workplace. See § 20109(b)(1)(A). This might have been an error as Lockhart explicitly states in a parenthetical that Stokes involved subsection (b)(1)(A). See Lockhart, 266 F. Supp. 3d at 663. Lockhart also cites another Third Circuit case, Port Auth. Trans-Hudson Corp. v. Sec'y, United States DOL ("PATH"), 776 F.3d 157, 166 (3d Cir. 2015), for the proposition that courts have held subsection (b)(1)(A) contains a work-related limitation. See Lockhart, 266 F. Supp. 3d at 663. But PATH's holding was that § 20109(c)(2) has a work-related limitation, PATH, 776 F.3d at 159; the PATH court simply assumed, in the process of interpreting subsection (c)(2), that reports protected by subsection (b)(1)(A) must be related to work. PATH, 776 F.3d at 166.

24

years earlier was certainly not a condition under the LIRR's control."). While a plaintiff's physical condition could be what creates the "hazardous safety or security condition" that the plaintiff later reports, the focus should be on the alleged condition that creates a risk to railroad operations. After all, the FRSA is a railroad safety statute, not a personal safety statute. See § 20101. Under this Court's interpretation of "condition," then, the Lockhart court should have examined whether the plaintiff's performance of his job functions while under the influence of Oxycodone would be a "hazardous safety or security condition." § 20109(b)(1)(A).[16] Here, a reasonable jury could conclude Plaintiff's off-premises intoxication became a "hazardous safety or security condition" when Brass asked him to report to the derailment site—a condition that the same reasonable jury could conclude Plaintiff reported "in good faith" as required by the statute.

Finally, this Court again lacks a textual basis to conclude, as the Lockhart court did, that the reported "hazardous safety or security condition" must be "work-related." Lockhart, 266 F. Supp. 3d at 663. But even if this additional requirement were imposed on FRSA plaintiffs, the Court could not award Defendant the relief it seeks. As discussed, the "hazardous safety or security condition" reported by Plaintiff was not his own intoxication; it was the threat posed by his intoxication to railroad safety if he reported to work. Plaintiff would therefore clear this non-existent hurdle.

---

[16] Viewed this way, the "condition" is certainly "under the [railroad's] control." Lockhart, 266 F. Supp. 3d at 266. The railroad can simply stop the employee creating the risk from working. In fact, the power to eliminate the dangerous condition was precisely the type of "control" contemplated by the Third Circuit in a case cited by Lockhart. See Stokes, 657 Fed. App'x. at 82 (citing another FRSA provision that "contemplat[es] advanced notice to the railroad carrier that could allow the hazardous condition to be 'corrected' before work stoppage takes place").

Defendant has also failed to meet its burden regarding whether Plaintiff's refusal to report to the derailment was protected under subsection (b)(1)(B). In subsection (b)(1)(B), the "work-related" hurdle is built into the statute's text. See § 20109(b)(1)(B) (protecting, under certain conditions, refusals to work "when confronted by a hazardous safety or security condition *related to the performance of the employee's duties*") (emphasis added). As discussed, the Court finds Plaintiff's refusal to work was sufficiently related to work. Specifically, Plaintiff's off-premises intoxication became a "hazardous safety or security condition related to the performance of [his] duties" when Brass asked him to report to the derailment site.

Turning to additional conditions that must be met for an employee's refusal to work to be protected, the Court finds that a genuine dispute of material fact exists with respect to those as well. First, regarding the requirement that the refusal be "in good faith" with "no reasonable alternative to the refusal [] available, § 20109(b)(2)(A), the Court examined the facts that could support a jury's finding of good faith in the context of its analysis of Plaintiff's § 20109(a) claim. And a reasonable jury could find that "no reasonable alternative" existed because Plaintiff was under the influence of alcohol, and any acquiescence would have meant being drunk on the job. Next, a genuine factual dispute exists as to whether a reasonable individual in Plaintiff's position would conclude there was a risk of death or serious injury that could not be eliminated given the urgency of the derailment: an intoxicated person responding to such an accident puts himself and others in serious danger. Finally, a reasonable jury could find the third condition inapplicable because it was not possible for the hazardous condition—the threat of Plaintiff working on the railroad while intoxicated—to be "corrected immediately[.]" §

20109(b)(2)(C). Plaintiff needed time to become sober before reporting to the derailment site.

In sum, Defendant has not shown that Plaintiff's report of his own intoxication and his refusal to report were unprotected as a matter of law. Accordingly, the Court will not grant summary judgment on this ground.

### ii.  Refusal to Drive to Selkirk on March 14, 2017

Plaintiff also claims that his refusal to drive to Selkirk on March 14, 2017 was protected, both as a good-faith report of a hazardous safety or security condition under subsection (b)(1)(A) and as a refusal to work when confronted by such a condition under subsection (b)(1)(B). Because Defendant has not shown Plaintiff's report of the snowstorm and refusal to drive in it are unprotected as matter of law, and because a reasonable jury could find Plaintiff acted in good faith, the Court denies summary judgment with respect to Plaintiff's retaliation claim premised on this alleged protected activity.

The Court again begins with Plaintiff's argument that his actions are protected because he "report[ed], in good faith, a hazardous safety or security condition[.]" § 20109(b)(1)(A). First, regarding the reporting requirement, Defendant argues that Plaintiff "did not even report a particular issue related to the safety of the roads or highways." Reply at 11. But a reasonable jury could find credible Plaintiff's retelling of the conversation with Brass; in that version, Plaintiff expressed concern about treacherous roads and accident potential. See Pl.'s SMF at 7–8; Pl.'s Decl. ¶ 5. Second, a genuine dispute of material fact exists as to whether Plaintiff's report of the snowstorm was in good faith; a reasonable jury could conclude that it was because he allegedly told Brass that he was concerned about getting into an accident.  See Pl.'s SMF at 7–8; Pl.'s Decl. ¶ 5. And a jury could also find the requisite "good faith" in the fact that

Plaintiff allegedly followed through on his promise to travel to Selkirk the following morning. See Pl.'s Dep at 16. Defendant argues that Plaintiff's report was not objectively reasonable because he did not personally observe road conditions. See Reply at 12. But a jury could easily reject that firsthand knowledge of the hazard is required, particularly where Plaintiff had been receiving reports of the impending snowstorm for days. See Dkt. No. 35-6. Third, regarding whether the snowstorm constituted a "hazardous safety or security condition", § 20109(b)(1)(A), the Court reiterates that the statute contains no qualifier requiring the condition to be related to railroad operations.  See Gayle, 342 F.3d at 92 ("Statutory construction begins with the plain text and, if that text is unambiguous, it usually ends there as well."). And even if such a qualifier were present, a snowstorm impeding a worker's ability to travel to a switching yard to oversee operations during a snowstorm is sufficiently related to the workplace.

The Court next turns to whether Plaintiff's refusal to drive to Selkirk was protected as a "refus[al] to work when confronted by a hazardous safety or security condition related to the performance of the employee's duties[.]" § 20109(b)(1)(B). A reasonable jury could certainly conclude that the snowstorm constituted a "hazardous safety or security condition related to the performance of [Plaintiff's] duties[.]" Cf. Kuebel v. Black & Decker Inc., 643 F.3d 352, 359 (2d Cir. 2011) (noting, in the context of the Fair Labor Standards Act, that a "fact-dependent inquiry" dictates whether something is part of an employee's principal activities). The snowstorm seems to have related to Plaintiff's job function because Brass called Plaintiff to either order him to drive through it to Selkirk Yard or see if he would be driving through it to Selkirk Yard. See Def.'s SMF ¶ 36; Pl.'s SMF at 7.

Finally, the Court examines the conditions found in subsection (b)(2), each of which

must be met for Plaintiff's refusal to work to be protected. The Court finds that a genuine

dispute of material fact exists as to whether they are met and, therefore, whether Plaintiff's

refusal to drive through the snowstorm was FRSA-protected activity. First, a reasonable jury

could conclude that Plaintiff acted in good faith and that he lacked any reasonable alternative

because, in his version of events, he made Brass aware of his weather-related concerns.

See Pl.'s SMF at 7–8; Pl.'s Decl. ¶ 5. Second, a reasonable jury could find that a reasonable

person in Plaintiff's position would decide that the snowstorm created "an imminent danger of

death or serious injury" and that the urgency of the situation did not "allow sufficient time to

eliminate the danger without such refusal[.]" § 20109(b)(2)(B). Defendant argues that, because

Plaintiff apparently never left his house, "he did not engage in a protected refusal to work as a

matter of law." Reply at 12. However, "[i]n evaluating the objective reasonableness of an

FRSA plaintiff's conduct, courts assume the perspective of one with 'the knowledge available

to a reasonable person in the same factual circumstances with the same training and experience

as the aggrieved employee.'" Tompkins, 2018 U.S. Dist. LEXIS 163198, at *14 (quoting

Hernandez v. Metro-North Commuter R.R., 74 F. Supp. 3d 576, 580 (S.D.N.Y. 2015)). The

parties agree that Brass had forewarned Plaintiff multiple times about the severity of the storm.

See Dkt. No. 35-6 (emails from Brass). This case therefore is distinguishable from Castle Coal

& Oil Co. v. Reich, 55 F.3d 41 (2d Cir. 1995), a Surface Transportation Assistance Act case

relied upon by Defendant to show that a plaintiff's refusal to work is not objectively reasonable

when they do not attempt to work. See Reply at 12. In that case, "the only evidence [plaintiff]

presented to support the reasonableness of his fears was his own testimony that he felt he was in

imminent physical danger." Reich, 55 F.3d at 45. Here, Brass' emails warning of the storm

show Plaintiff was not alone in viewing it as a threat. Therefore, a jury could find Plaintiff acted reasonably in finding the snowstorm posed a serious risk. And a reasonable jury could find the third condition inapplicable because it was not possible for the snowstorm to be "corrected immediately[.]" § 20109(b)(2)(C).

The Court cannot conclude that Plaintiff's report of the snowstorm and refusal to drive to work in it were unprotected as a matter of law. And there are genuine factual disputes as to whether Plaintiff's actions on March 14, 2017 were protected. Accordingly, summary judgment is inappropriate.

### iii.  Refusal to Drive to Canada on July 13, 2017

Finally, Plaintiff argues his refusal to drive to Canada on July 13, 2017 was protected by the FRSA. He claims protection for his failure to drive to Canada that night both as a good-faith report of a hazardous safety or security condition (namely, his fatigue, see Pl.'s Decl. ¶ 7) under subsection (b)(1)(A) and as a refusal to work when confronted by such a condition under subsection (b)(1)(B). Because Defendant has not established that Plaintiff's actions were unprotected as a matter of law, and because the Court is presented with genuine issues of material fact, the Court denies summary judgment on this issue as well.

First, a genuine dispute of material fact exists as to Plaintiff's reasons for not traveling to Canada on July 13, 2017. Defendant argues Plaintiff simply wanted to put his kids to bed, but Plaintiff asserts that he told Brass that he was fatigued. Compare Def.'s SMF ¶ 55 with Pl.'s SMF at 14; Pl.'s Decl. ¶ 7. A reasonable jury could credit Plaintiff's account and find that he acted in good faith, both subjectively and objectively. See Bostek, 2019 U.S. Dist. LEXIS 110623, at *10.

Looking next at whether Plaintiff's actions could be protected as a report of a hazardous safety or security condition, § 20109(b)(1)(A), the Court concludes that Defendant has not established it is entitled to judgment as a matter of law. On this point, Defendant reiterates its argument that the "hazardous safety or security condition" referenced in subsection (b)(1)(A) must be under the control of the defendant-railroad. See Reply at 13.[17] But, as discussed above, there is no indication on the face of the statute that Congress intended to impose such a requirement. And even if the words "under the railroad's control" were tacked on to the end of the statutory phrase "hazardous safety or security condition," a reasonable jury could find that the railroad *did* exercise sufficient control here, as it had the power to stop Plaintiff from driving to Canada while fatigued.

Finally, the Court turns to whether Plaintiff's decision not to drive to Canada could be protected as a "refus[al] to work when confronted by a hazardous safety or security condition related to the performance of the employee's duties[.]" § 20109(b)(1)(B). A reasonable jury could again conclude that fatigue constituted a "hazardous safety or security condition related to the performance of [Plaintiff's] duties[.]" Cf. Kuebel, 643 F.3d at 359 (noting, in the context of the Fair Labor Standards Act, that a "fact-dependent inquiry" dictates whether something is part of an employee's principal activities). A jury could find that the fatigue related to Plaintiff's job function because Plaintiff experienced the fatigue at a time when Brass asked him to drive to

---

[17] Defendant also notes that "[o]ther statutes specifically state" that employees are protected when fatigue impacts their ability to operate a motor vehicle and argues that Congress "decided not to extend such broad protection for fatigue under the FRSA." Reply at 13. But as support, Defendant cites only 49 CFR § 392.3, a Department of Transportation *regulation*, not a statute. Congress' omission of an explicit reference to fatigue-related refusals is therefore not entitled to the weight Defendant would assign to it.

Canada to inspect track conditions. See Def.'s SMF ¶ 54. As to the conditions found in subsection (b)(2), the Court finds that a genuine dispute of material fact exists as to whether they are met and, therefore, whether Plaintiff's refusal to drive while fatigued was an FRSA-protected activity. First, a reasonable jury could conclude that Plaintiff acted in good faith and that he lacked any reasonable alternative because he allegedly told Brass about his fatigue. See Pl.'s SMF at 14. Second, a reasonable jury could find that a reasonable person in Plaintiff's position would decide that the his exhaustion created "an imminent danger of death or serious injury" and that the urgency of the situation did not "allow sufficient time to eliminate the danger without such refusal[.]" § 20109(b)(2)(B). And again, a reasonable jury could find the third condition inapplicable because it was not possible for Plaintiff's fatigue to be "corrected immediately[.]" § 20109(b)(2)(C).

In sum, Defendant has not established that it is entitled to judgment as a matter of law on the protected activity element of Plaintiff's § 20109(b) claim. Defendant has not shown that any of the three protected activities claimed by Plaintiff—his refusals to drive while intoxicated, when facing a snowstorm, and when fatigued—are unprotected as a matter of law. And genuine disputes of material fact exist as to whether Plaintiff acted reasonably and in good faith, showings which are necessary to his claims of protection.

> b. Whether the Protected Activity was a Contributing Factor to Plaintiff's Discharge

The Court turns to the only other disputed element of Plaintiff's prima facie case: whether Plaintiff's three allegedly protected activities were each contributing factors to his discharge. Because there are genuine disputes of material fact as to whether the activities

contributed to Defendant's decision, the Court denies summary judgment on this ground.

### i. Refusal to Drive to the Derailment While Intoxicated

As discussed in the context of Plaintiff's § 20109(a) claim, there is both direct and circumstantial evidence supporting a potential jury finding that Plaintiff's refusal to drive to the derailment while intoxicated was a contributing factor in his discharge. As direct evidence, Defendant admitted Plaintiff's refusal played a role in his termination, saying it fired Plaintiff for a "pattern of behavior [that] culminated on July 15, 2017, when Kurec failed to engage or oversee the remediation of a derailment site in Albany." Def.'s Mem. at 5. And Mellish, who made the termination decision, explicitly stated that Plaintiff would not have been fired had he responded to the derailment. See Mellish Dep. at 8. Mellish responded affirmatively when asked whether Plaintiff's failure to respond was the biggest factor in the termination. See id. Next, the short temporal gap between Plaintiff's refusal and his discharge is powerful circumstantial evidence. The Court's conclusion applies with equal force on this claim.

### ii. Refusal to Drive to Selkirk on March 14, 2017

The Court concludes that a reasonable jury could find that Plaintiff's allegedly protected refusal to drive to Selkirk on March 14, 2017 was a contributing factor in his termination. First, Mellish stated that he "gave a lot of weight" to Plaintiff's refusal to go to Selkirk in deciding to fire him. See Mellish Dep. at 8. And when Mellish informed Plaintiff that his employment status was being reviewed, Mellish allegedly made explicit reference to Plaintiff's failure to go to Selkirk. See Pl.'s Dep. at 24. The Court has no trouble concluding that a jury could find that Plaintiff's refusal to drive to Selkirk on the night of March 14, 2017 was a "factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision."

33

Niedziejko, 2019 U.S. Dist. LEXIS 514666, at *93 (quoting Araujo, 708 F.3d at 158).

### iii.  Refusal to Drive to Canada on July 13, 2017

The Court also decides that a genuine dispute of material fact exists as to whether Plaintiff's allegedly protected refusal to drive to Canada on July 13, 2017 was a contributing factor in his discharge. Mellish also allegedly mentioned this refusal when informing Plaintiff that his employment status was under review. See Pl.'s Dep. at 24. The Court cannot decide, then, that Plaintiff's fatigued refusal to cross the border on the night of July 13, 2017 did not "affect in any way the outcome of the decision." Niedziejko, 2019 U.S. Dist. LEXIS 514666, at *93 (quoting Araujo, 708 F.3d at 158).

In sum, the Court cannot conclude that any of the allegedly protected activities claimed by Plaintiff did not contribute to his termination as a matter of law. Genuine issues of material fact exist as to Defendant's motivation for Plaintiff's termination; the resolution of such disputes is the province of the jury.

### B.  New York Labor Law § 201-d

Plaintiff also brings a claim pursuant to New York Labor Law § 201-d(2)(b), which prevents employers from firing an individual because of his or her "legal use of consumable products prior to the beginning or after the conclusion of the employee's work hours, and off of the employer's premises and without use of the employer's equipment or other property[.]" § 201-d(2)(b). The Court dismisses this claim for lack of subject-matter jurisdiction.

In Martinez v. State Univ. of N.Y., a New York appellate court held that "claims under Labor Law § 201-d (unfair labor practices) are matters which fall within the exclusive, nondelegable authority of the Public Employment Relations Board[.]" 294 A.D.2d 650, 651

34

(N.Y. App. Div. 2002). The Martinez court thus affirmed the state trial court's dismissal.

Similarly, in Ifill v. N.Y. State Court Officers Ass'n, a court in this Circuit refused to exercise

supplemental jurisdiction over a claim falling within the exclusive jurisdiction of the Public

Employment Relations Board. 655 F. Supp. 2d 382, 392 (S.D.N.Y. 2009).

Rather than intrude on the domain of the Public Employment Relations Board, the Court

dismisses Plaintiff's state-law claim for lack of subject-matter jurisdiction.

### C. Punitive Damages

Defendant asks the Court to dismiss the claim for punitive damages against him. See

Def.'s Mem. at 25 n.2.  However, "[g]enerally, the issue of whether defendants' conduct is

sufficiently serious to warrant punitive damages is a question best left to the jury." Lozada v.

Weilminster, 92 F. Supp. 3d 76, 108 (E.D.N.Y. 2015); see also Lin v. Cty. of Monroe, 66 F.

Supp. 3d 341, 362 (W.D.N.Y. 2014) ("Generally, the issue of whether to award punitive

damages is an issue for the jury to decide based on an evaluation of the plaintiffs['] proof of

sufficiently serious misconduct."). For this reason, "because [Plaintiffs] ha[ve] provided

sufficient evidence to overcome summary judgment, the Court cannot state as a matter of law

that [they] [are] not entitled to punitive damages." See Emblen v. Port Auth. of New York/New

Jersey, No. 00-CV-8877, 2002 WL 498634, at *12 (S.D.N.Y. Mar. 29, 2002).

### V.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendant's Motion (Dkt. No. 35) is **DENIED**; and it is further

**ORDERED**, that the Plaintiff's claim in the Complaint (Dkt. No. 1) for violation of New York Labor Law § 201-d(2)(b) is **DISMISSED without prejudice** for lack of subject-matter jurisdiction; and it is further

**ORDERED**, that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**[18]

DATED:      November 04, 2020
            Albany, New York

Lawrence E. Kahn
U.S. District Judge

---

[18]   Due to the delays and disruptions caused by the COVID-19 pandemic, some cases/motions were not disposed of prior to the end of the reporting period.